Leo Moceri v. Commissioner.
Moceri v. Commissioner
Docket No. 3690-67.
United States Tax Court
T.C. Memo 1969-33; 1969 Tax Ct. Memo LEXIS 263; 28 T.C.M. (CCH) 155; T.C.M. (RIA) 69033; February 18, 1969, Filed John J. Kane, Jr., 1405 Superior Bldg., Cleveland, Ohio, for the petitioner. Larry L. Nameroff, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioner's income tax and additions to the tax for the years and in the amounts as follows: *11
Additions
Year
Deficiency
Sec. 6653(a)
Sec. 6651(a)
Sec. 6654
1958
$3,022.52
$151.13
$ 755.63
$ 80.66
1959
7,784.99
389.25
1,946.25
212.93
1960
3,497.56
174.88
874.39
97.92
1961
3,179.00
158.95
794.75
89.01
The issues for decision are: (1) Whether the petitioner had taxable income in each of the calendar years 1958 through 1961, and, if so, the amount thereof. (2) If petitioner did have taxable income in the years *264 1958 through 1961, whether any part of his underpayment of tax was due to negligence or to intentional disregard of rules and regulation, whether his failure to file returns for the years in issue was due to reasonable cause and not due to willful neglect, and whether he is liable for the addition to tax for underpayment of estimated tax. Findings of Fact Petitioner, Leo Moceri, is an individual whose residence at the time of the filing of the petition in this case was Akron, Ohio. He filed no Federal income tax returns for the years 1958 through 1961. Petitioner was born in Detroit, Michigan, and lived there until about 1930. Beginning sometime in 1927 petitioner began "bootlegging" whiskey for another person. In 1929 he began to buy and sell whiskey "on his own." He would buy his whiskey in Detroit and take it to Toledo by car where he would sell it. He would use part of his profits from the sale of each carload of whiskey to buy more whiskey and would save most of the balance. He kept the money he saved in the house in which he was living. In 1930 petitioner moved from Detroit to Toledo, Ohio, but continued his bootlegging business until sometime in 1932 156 when he and *265 seven or eight other members of the Licavoli gang were indicted for murder. The "Licavoli gang" had the general reputation of being engaged in "bootlegging" activities. Petitioner received news of his indictment from a newspaper story and immediately left Toledo with his wife, Marguerite. When he left Toledo he took the money he had been saving with him. He stopped at his mother's home in Detroit and left part of the money with her and kept the remainder. From the time of his indictment in 1932 until 1951 petitioner was a fugitive and moved with his wife from place to place using various aliases. He would return at times to his mother's home and get some of the money he had left with her. During the years when he was a fugitive petitioner lived on money he had previously saved. He always owned a car during those years. In 1951 he was apprehended in Los Angeles and brought back to Toledo to answer the murder indictment. At the time he was arrested in Los Angeles, he had $1,800 in cash on his person and a Cadillac automobile. The murder indictment against petitioner was dismissed, he was indicted and convicted of extortion, and sentenced to a term of from one to five years. On July 2, 1957, petitioner *266 was released from prison. His wife and his brother went to meet him upon his release. Prior to his confinement in the penitentiary, petitioner had lent his sister over $13,000. While petitioner was in prison, petitioner's sister repaid $600 at one time and at another time $10,000 of the amount to petitioner's wife. Petitioner's wife had come from California after petitioner's apprehension and had gone to the home of petitioner's sister to live. Petitioner's wife purchased a trailer with part of the $10,000 repaid to her by petitioner's sister and moved from the home of petitioner's sister into the trailer which she placed in a trailer park in Detroit. She lived in the trailer and kept the part of the $10,000 in cash which she had left in the trailer while petitioner was in the penitentiary. Petitioner's wife was employed in an apparel shop during most of the time petitioner was in the penitentiary and for a short while after his release. Her take-home pay during most of the time of her employment was approximately $55 a week. Petitioner's wife bought some furnishings for the trailer on credit and paid for the furnishings from her own earnings. She also saved some part of her earnings *267 and kept such savings in cash in the trailer. Petitioner's wife purchased a Plymouth automobile and later an Oldsmobile automobile while petitioner was in prison and she still owned the Oldsmobile at the beginning of 1958. When petitioner was released from prison his sister repaid him $1,000 of the over $13,000 he had loaned to her. Petitioner's mother died while petitioner was in prison. After petitioner was released from prison his brother Joe handed him a box containing cash. Petitioner had been told by his brother that their mother shortly before she died had handed petitioner's brother the box containing petitioner's cash and asked petitioner's brother to keep it for petitioner until petitioner was released from prison. In 1956 petitioner's wife was injured in an automobile accident and received a net payment for damages of $2,500.00. She deposited this $2,500 in the Manufacturers National Bank of Detroit. In 1958 petitioner purchased a home at 340 Monroe Street, N.W. in Warren, Ohio. Preceding the actual purchase, petitioner had indicated to the real estate firm handling the transaction that he wished title to be taken in the name of a James Matash. Matash lived in Warren *268 and was in the home remodeling business. When petitioner and his wife went to the First Federal Savings and Loan Association of Warren to obtain a loan for a part of the purchase price they found that the bank would lend the money to them if they took title to the home in their own names and they did take title in their names. Petitioner paid $4,000 down on the home and financed $7,000 of the price through a mortgage loan from the First Federal Savings and Loan Association of Warren. In his application for this loan, dated November 3, 1958, petitioner stated that "applicant is 51 years of age, employed by Imperial Home Imp. Co. the past 6 mons., earning $400-500 per month and is married." Petitioner had hoped to become a salesman for Imperial Home Improvement Company but was never actually so employed. On the loan application petitioner also listed the name of his wife Marguerite and listed as references the Manufacturers National Bank of Detroit and the furniture company from which she had purchased furniture for the trailer on credit. 157 Petitioner under date of May 18, 1959, made another application for a loan to the First Federal Savings & Loan Association of Warren. *269 In this application he stated that the purpose of the loan was to "refinance and use to [purchase] 410 Mahoning N.W." He further stated that "applicant is 52 years of age, employed by Imperial Home Impr. Co. the past year, earning $400-500 per month, and is married." Petitioner made another application, dated January 8, 1960, to the same institution for a loan of "max - 15 year." The purpose of the loan was stated to be for "refinance and use in business." He also stated that "applicant is 52 years of age, employed by Imperial Home Imp. Co." as a salesman. In 1958 when petitioner purchased the home on Monroe Street in Warren, he still owned the house trailer and he and his wife were living in this trailer which they had moved from Detroit to Warren. At that time petitioner also owned two cars. Petitioner spent $3,525.79 for improvements on the Monroe Street house in 1958 and $11,700 for such improvements in 1959. Petitioner and his wife both personally worked on the improvements to the house from November 1958 until the latter part of 1959. During this time petitioner was not otherwise employed. Petitioner sold the Monroe Street property in 1960 for $21,000 and in that year purchased *270 an apartment in a cooperative apartment building. In 1961 petitioner moved from Warren to Akron, Ohio. The police had kept close surveillance of petitioner in Warren and petitioner had for this reason decided that he preferred to live in Akron. In Akron petitioner purchased property from a person named Lucas and took title in the name of Leonard Martin. Lucas was a part owner of King Steer's Drive-in in Akron. In 1958 petitioner purchased two 1958 Chevrolet Impalas at a cost of $2,480 and $2,475, respectively. He sold his 1956 Oldsmobile and one of the 1958 Chevrolet Impala's for $1,600 and $2,200, respectively, in 1958. In 1959 petitioner purchased two automobiles. One was a Chevrolet Corvair, title to which was taken in his wife's name. The price he paid for the Corvair was $2,313. The other car which petitioner purchased in 1959 was a 1960 Chevrolet Impala. Petitioner paid $80 cash down on this car, was allowed a credit of $1,342.50 for a 1958 Chevrolet which he traded in and financed the remaining cost of the car. In 1961 petitioner purchased a 1961 Cadillac. This car had been won in a raffle by an acquaintance of petitioner and petitioner purchased the car from the individual *271 who had won it. In that same year petitioner applied for and received a loan of $3,000 from the Akron Dime Bank. Petitioner gave the bank as security for this loan a lien on his 1961 Cadillac and had the loan guaranteed by Nunzie Destro. Petitioner advised the loan officer of the bank that he was employed by King Steer, Inc. as manager. At that time petitioner had hoped to be able to purchase the stock of this drive-in and operate it as his business. He was not able to purchase the stock and was never employed by King Steer, Inc. In 1961 petitioner applied to the State of Ohio for a certificate of title for a 1962 Oldsmobile. He was indicted in 1962 under the Auto Title law RC 4505.19E on the grounds that he unlawfully used a false and fictitious address in an application for a certificate of Title to a Motor Vehicle. He pleaded guilty to the indictment and was convicted and sentenced to 60 days in the workhouse. Petitioner had listed an incorrect street number for his address on his application for the certificate of title. Petitioner's wife was not gainfully employed at any time during 1958 or 1959 and had no income during the years 1958 through 1961 other than the sum of $680.66 *272 in 1960 shown on the income tax return she filed for that year. Petitioner's wife never knew the nature of petitioner's employment, if any, at least from the time of petitioner's indictment for murder when they left Toledo. Petitioner and his wife were living in a furnished apartment in Los Angeles, California, which they rented for $55 per month at the time petitioner was apprehended. Petitioner's wife would stay at home most of the time and her only employment was in housekeeping. The investigation of petitioner's income tax liability for the years here in issue arose in connection with certain agents being assigned to an "Organized Crime Drive." The file given to the special agent assigned to investigate petitioner's tax liability contained statements to the effect that petitioner was connected with the "Licavoli gang." The special agent reviewed police records, investigated leads he was given and made other investigations but found no indication that petitioner was employed during the 158 years here in issue. He found no indications of income which petitioner might have received during the years here in issue During the course of the investigation the special agents interrogated *273 petitioner with respect to any income he might have received during the years here in issue. Petitioner told the special agents during this investigation that he had not filed any income tax returns because he did not have any income. He told them that he had money but would not answer their question as to where his money came from. Petitioner would not answer the special agent's question as to whether he ever received any gifts or inheritances. He also told the agents that he had no books and records. After petitioner had been interviewed by the special agents, an attorney representing petitioner told the Regional Counsel in Cincinnati that petitioner had a cash hoard in Detroit while he was in the penitentiary and that his brother held this for him. This attorney also told the Regional Counsel that petitioner's sister gave petitioner's wife money. The special agents talked to petitioner's brother and he told them that his mother on her death bed gave him a box of money to hold for petitioner until petitioner got out of jail. He told them that when petitioner was released from jail, he and petitioner got the box and counted the money, but he would not tell the agents how much money *274 was in the box. Petitioner was indicted under section 7203 of the Internal Revenue Code of 1954 for each of the years 1958 through 1961 for willful failure to file Federal income tax returns. Petitioner was tried and found not guilty. Respondent determined deficiencies in petitioner's Federal income tax for the calendar years 1958 through 1961 on the basis of increases in his net worth plus nondeductible expenditures. The computation attached to respondent's notice of deficiency is as follows: 159 ASSETS
12-31-57
12-31-58
12-31-59
12-31-60
12-31-61
Cash and Bank Accounts
Cash on hand
$5,049.40
Savings Account #29-551 Mfg. National Bank, Detroit
2,500.00
Savings Account #34289 First Fed. Sav. & Loan, Warren
$ 2,532.21
$ 171.91
Savings Account #TS-29-1169 Mfg. Nat. Bank, Detroit
$ 3,841.75
Savings Account #3206-3822 First Nat. Bank, Miami
300.00
Checking Account #3206-3822 First Nat. Bank, Akron
$ 365.05
Real Estate
340 Monroe St., Warren, Ohio
11,000.00
11,000.00
340 Monroe St., Improvements - A. Morgan
807.57
1,105.46
340 Monroe St., Improvements - J. Pascarella
990.00
1,700.00
340 Monroe St., Improvements - N. Gilbert
1,728.22
3,403.12
340 Monroe St., Improvements - H. Lisi
1,125.00
340 Monroe St., Improvements - Other J. Pascarella
4,366.42
8955 Collins Avenue, Miami, Fla.
12,590.00
13,590.00
577 Hidden Valley Dr., Akron, Ohio
27,061.76
Miscellaneous
Loan receivable - Ray and Rose Randazzo
2,300.00
2,300.00
2,300.00
2,300.00 2,300.00
1954 Howard Trailer, SN7414-41 4,450.60
4,450.60
4,450.60
4,450.60
Total Assets $14,300.00
$23,808.60
$42,212.51
$24,482.35 $29,726.81
*275 160 LIABILITIES
12-31-57
12-31-58
12-31-59
12-31-60
12-31-61
Mortgage Loan #10939 First Fed. Sav. & Loan
$ 6,983.57
$ 3,865.26
Note - Ben Schick - 8955 Collins Ave., Miami
10,590.00
Mortgage Loan #67846, Akron Sav. & Loan, 577 Hidden Valley
$16,134.27
Total Liabilities $ 6,983.57
$14,455.26 $16,134.27
Assets less liabilities - Net Worth
$14,300.00
$16,825.03
$27,757.25
$24,482.35
$13,592.54
Less prior year's net worth
14,300.00
16,825.03
27,757.25
24,482.35
Increase in net worth
2,525.03
10,932.22
( 3,274.90)
(10,889.81)
Adjustment to increase in net worth
9,208.57
10,783.83
16,063.21
23,339.86
Adjusted gross income as corrected
11,733.60
21,716.05
12,788.31
12,450.05
Adjusted gross income per return
Understatement of income 11,733.60
21,716.05
12,788.31
12,450.05
Additions:
Purchased 1958 Chevrolet Impala F58F141310
$ 2,480.00
Purchased 1958 Chevrolet Impala F58F215332
2,475.00
Purchased 1960 Chevrolet Corvair 00769W1411189
$ 2,313.00
Purchased 1960 Chevrolet Impala 01837F116903
80.00
Water Utilities Paid
38.88
$ 22.12
Electric Utilities Paid
85.56
45.05
Gas Utilities Paid
184.40
85.76
Interest Paid - First Fed. Sav. & Loan Acct. #10939
53.57
253.90
22.37
Other Personal Cost of Living Expenses
8,000.00
8,000.00
6,000.00
6,000.00
Purchased 1961 Oldsmobile 615M03881
3,352.35
Purchased 1961 Cadillac 61 G014393
4,300.00
Expense of Sale - 340 Monroe St., Warren
1,191.00
Interest Paid - First Fed. Sav. & Loan Acct. #11942
271.88
Payments on 1960 Chevrolet - Universal C.I.T.
1,477.02
Paid Loan Expense - First Fed. Sav. & Loan
105.00
Interest Paid - Dime Bank of Akron, Ohio Loan #42-47
40.00
Interest and Taxes Paid Akron Sav. & Loan
702.51
Purchased 1962 Oldsmobile
3,850.00
Transfer funds to Marguerite - Chase Fed. Savings & Loan
3,841.75
Transfer 8955 Collins Ave. to Marguerite
13,590.00
Transfer Howard Trailer to Marguerite
4,450.60
[sic]
Total Additions $13,008.57
$10,955.74
$16,872.05
$32,474.86 12-31-58
12-31-59
12-31-60
12-31-61
Reductions:
Sale of 1956 Oldsmobile 567M68577
$1,600.00
Sale of 1958 Chevrolet F58F141310
2,200.00
Pro Rata Tax Rebate - 340 Monroe St.
$ 171.91
Refund of Real Estate Commission 340 Monroe
$ 90.02
Unidentified Check Deposited - Union Sav. & Trust Bank, Warren
3816
Income Reported on Form 1040, 1960 Marguerite Moceri
680.66
Sale of 1960 Chevrolet
$2,100.00
Sale of 1961 Cadillac
4,035.00
Sale of 1961 Oldsmobile
3,000.00
Total Reductions $3,800.00
$ 171.91
$ 808.84
$9,135.00
Additions less Reductions - Net Adjustment to Net Worth $9,208.57
$10,783.83
$16,063.21
$23,339.86
*276 161 Opinion Petitioner contends that the net worth statement on which respondent based his determination is arbitrary and therefore the presumptive correctness of respondent's determination is rebutted. He further contends that the evidence shows certain specific errors in the determination and that particularly there is error in respondent's determination of cash-on-hand at the beginning of 1958. Petitioner also takes the position that judgment of his acquittal of the indictment under section 7203 for willful failure to file Federal tax returns is collateral estoppel in this case. He distinguishes Helvering v. Mitchell, 303 U.S. 391 (1938), which holds that a judgment of acquittal in a criminal action is no bar to a civil action arising out of the same facts on the ground that the Court in its unreported Memorandum Opinion in United States v. Leo Moceri, (N.D. Ohio), filed March 26, 1965, stated that "not one scintilla of proof appears in the record to the effect that the defendant during the years involved engaged in any income-producing activity." We do not agree with petitioner that this holding by the District Court distinguishes this case from Helvering v. Mitchell, supra. *277 The differences in the nature of the proof required and the party upon whom the burden rests in a criminal and civil case was the basis for the holding in Helvering v. Mitchell, supra. In the instant case there is not one scintilla of proof that petitioner engaged in any income producing activities during the years in issue. However, this conclusion does not dispose of the case since the burden in the instant case is on petitioner to show that respondent's determination is either arbitrary or erroneous. Numerous cases have held that computation of income by the net worth plus nondeductible expenditures method in the notice of deficiency does not per se cause respondent's determination to lose its presumption of correctness even though no probable source of income is shown to exist. Although some errors have been shown to exist in respondent's net worth computation (without considering petitioner's claimed "cash on hand from bootlegging") such as the failure to include the cost of the Oldsmobile purchased by petitioner's wife as an asset at December 31, 1957 and the failure to consider cash which petitioner's wife might have accumulated other than that left from the *278 money repaid to her by petitioner's sister, these errors are minor. Unless petitioner did have substantial cash at the end of 1957 which he had retained from his bootlegging days, respondent's net worth computation is substantially correct. In the state of this record, we do not consider it necessary to rule on petitioner's contention that respondent's computation is arbitrary. If we were to conclude that petitioner did not have substantially more cash on hand than the amount determined by respondent, we certainly would not consider respondent to be arbitrary in not accepting as true various statements made to him to the effect that petitioner did have such cash on hand. If we conclude from the evidence that petitioner did have substantial cash on hand at the end of 1957 which he had accumulated during his bootlegging days, petitioner has sustained his burden of showing error in respondent's determination by such evidence. In this case we must determine whether the preponderance of the evidence supports the conclusion that as of January 1, 1958, petitioner had cash accumulated in prior years in excess of the amounts determined by respondent sufficient to cover his increases in *279 net worth plus nondeductible expenditures for the four years 1958 through 1961. Such amounts as computed by respondent total approximately $59,000 so that to completely explain respondent's computation of his "income" petitioner would have to show approximately $60,000 in cash as of December 31, 1957, in addition to his cash-on-hand at December 31, 1957, as determined by respondent. Petitioner testified that at the beginning of 1958 he had "over $70,000" remaining from cash accumulations from his "bootlegging" days. He testified that he was engaged in "bootlegging" from 1927 through 1932 and that from 1929 through 1932 was in the "bootlegging" business for himself. He testified that he ran at least 50 carloads of whiskey from Detroit to Toledo a month making a profit of from $500 to $700 a carload during this entire 3-year period. He also testified that he saved much of these profits and kept the money in his living quarters in cash until he was indicted for murder and became a fugitive. His testimony was that he took some of the money with him when he became a fugitive and left the remainder with his mother. Petitioner's mother died while petitioner was in the penitentiary. Petitioner *280 testified that when he was released 162 from the penitentiary his brother gave him his remaining cash which his mother had kept until her death and that the remaining cash was over $70,000. In analyzing the evidence we find support for the fact that petitioner was a "bootlegger" during the period 1927 through 1932 from his indictment as a member of the "Licavoli gang". This gang was generally believed to be engaged in bootlegging. In fact it was because of petitioner's activities in this connection that his income tax liability was subjected to investigation as a part of respondent's "Organized Crime Drive." From the evidence as a whole we conclude that petitioner was engaged in bootlegging during the period of approximately five years prior to the year 1933. The evidence also supports the conclusion that during his "bootlegging" days petitoner accumulated cash. Petitioner's wife testified to the fact that she and petitioner moved from one place to another during petitioner's fugitive days and that there was money available from petitioner for the costs of their many moves and for their living expenses. Her testimony indicates that they lived modestly. If we accepted petitioner's *281 estimate of his earnings during his bootlegging days, it would appear that his total earnings for the years 1929 through 1932 would amount to over $1,000,000. If petitioner's cash when he became a fugitive were even half such amount, it would appear that he would have substantial cash remaining when he was apprehended in 1951 since from the testimony of his wife as to their living standards the amount they spent during 19 years as fugitives would not approach $500,000. Respondent argues that we should not accept petitioner's testimony because of his criminal record and the fact that he has been shown to have falsified several loan applications. Respondent argues that the actions of petitioner during the years here in issue and the living standards of his wife while he was in the penitentiary belie any substantial cash being available to petitioner. While petitioner was in the penitentiary his wife lived very modestly in a trailer, bought furniture and perhaps an automobile on time payments and worked for a small salary. However, respondent now accepts the fact and has conceded that during all this time she had over $5,000 in cash in the trailer. The explanation petitioner's wife *282 gave was that she wanted to establish her credit and that in fact she did establish credit references which she and petitioner used when they applied for a loan for the purchase of a house. Petitioner's explanation for obtaining the loan for the house was that he wished to establish credit and his explanation for purchasing the automobile on credit was that it helped him obtain insurance. He stated that he had hoped to become a salesman for the company by which he stated he was employed and that he had hoped to acquire the "drive-in" business by which he stated he was employed. These explanations might not appear as adequate for petitioner's actions if there did appear in the record any probable or even possible source of income for petitioner during the years here in issue. Petitioner stated he had no source of income and no employment. Petitioner's wife stated that she knew of no employment of petitioner and that for approximately a year he spent most of his time working with her in improving the house they had purchased. The special agent after diligent investigation could find no evidence that petitioner was gainfully employed during the years here in issue. During these years *283 petitioner was continuously under surveillance by the police and the agent reviewed all the police records with respect to petitioner. The preponderance of the evidence in this record is that petitioner was not gainfully employed during any of the years here in issue. There is evidence independent of petitioner's testimony which indicates that petitioner had substantial accumulated cash as of the beginning of 1958. When petitioner was apprehended in 1951 he had $1,800 cash on his person and an automobile. Sometime before his apprehension he had loaned his sister over $13,000. The fact that this loan was made is not questioned by respondent and respondent calls attention to the fact that he has given credit for the trailer purchased with the partial repayment of this loan to petitioner's wife while petitioner was in the penitentiary, to the cash remaining from the partial repayment, and to the remainder owed to petitioner as of January 1, 1958 in his computation of net worth. We consider the inference that might be drawn from such a substantial loan by petitioner to his sister to be that petitioner had cash well in excess of the amount of the loan. A fugitive dependent on his accumulated *284 cash for living expenses would be unlikely to loan his total cash to a relative. 163 If petitioner had been willing to show respondent's agents any remaining cash which he had and permit them to count the money, we might have better evidence in this case. Petitioner instead, while insisting he still had some cash, refused to tell the agents how much, where the cash was, or to let them see it. This "lack of cooperation" if these actions when petitioner knew he was under criminal investigation are to be termed "lack of cooperation" we have considered along with all the evidence in this case. While the evidence is not overwhelmingly in favor of petitioner, we do conclude that the preponderance of the evidence is that petitioner did have cash-onhand as of the beginning of 1958 in an amount sufficient to account for the increases in his net worth plus nondeductible expenditures as determined by respondent for the years 1958 through 1961. Decision will be entered for petitioner.